**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CABRINI-GREEN LOCAL ADVISORY COUNCIL, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:96-cv-06949 |
| v. | ) ) | Judge Edmond E. Chang |
| CHICAGO HOUSING AUTHORITY, *et al.*, | ) ) ) | Magistrate Judge Heather K. McShain |
| Defendants. | ) ) | |

**MEMORANDUM OPINION & ORDER**

Over two decades ago, the Cabrini-Green Local Advisory Council filed this housing-discrimination case against the Chicago Housing Authority and the City of Chicago. R. 1. The litigation resulted in a now almost-21-year-old consent decree. R. 160. Last year, the Defendants moved to enforce a specific provision of the decree. R. 230. After extensive negotiations, the parties have agreed on a proposed resolution of the motion. R. 324. This Opinion explains why the Court approves the proposed settlement over the objection of a non-party.

## I. Background

### A. The Consent Decree

The consent decree resolved the case brought by the Local Advisory Council (which goes by its acronym, LAC), in which the LAC advanced claims under the Fair Housing Act, 42 U.S.C. § 3604, as well as other civil-rights laws. R. 1. Specifically, the LAC alleged that the City's and the Chicago Housing Authority's redevelopment

initiatives for the Cabrini-Green area on Chicago's near north side would unlawfully displace residents of the Cabrini-Green public housing project, diminish access to affordable housing in the area, and "result[] in a discriminatory impact upon African Americans, women[,] and children." R. 160, Consent Decree at 2. (For convenience's sake, the Opinion will refer to the Defendants collectively as the CHA, the Chicago Housing Authority's well-known moniker.)

In successfully negotiating the consent decree, the LAC secured promises of, among other things, guaranteed public-housing units and affordable-rental units. Consent Decree at 9 § II.C. Beyond those guarantees, the parties also addressed what would happen to the increasingly valuable CHA-owned land on the near north side. Specifically, the CHA agreed that private developers building on the land must grant the LAC both an ownership interest and a share of fees and profits in certain new development projects in Cabrini-Green. Consent Decree at 11 § III.A.1. The receipt of developer fees and profits, however, was conditioned on the LAC only using the money "for non-profit purposes to benefit current and displaced Cabrini-Green residents." *Id*. To hold the ownership interest and to receive developer fees, the consent decree expressly contemplated that the LAC would have an "affiliated development entity." *Id*. So, in 2003, the LAC created a non-profit organization called the Cabrini-Green Local Advisory Council Community Development Corporation (known as the CDC), whose stated purpose was to "provide relief" to Cabrini-Green residents. R. 244-1, Exh. B, CDC Bylaws at 1.

2

## B. The CHA's Motion to Enforce

After the CDC's creation in 2003, more than a decade passed without apparent incident. But in December 2016, the CHA's Office of Inspector General began receiving complaints that Carol Steele, who is the President of both the LAC and the CDC, had misappropriated CDC funds for her personal use. R. 230-1, Lischka Decl. ¶¶ 2, 6. Over the next 3½ years, the OIG undertook an investigation of the CDC's finances, which culminated in a report published in May 2020. *Id.* ¶ 3; R. 230-2, Exh. 1-A, OIG Report. In sum, the OIG Report concluded that Steele and the CDC had engaged in financial mismanagement of CDC's funds. OIG Report at 5.

In light of the OIG report, the CHA filed a motion to enforce and to modify the consent decree, Fed. R. Civ. P. 60(b), asking to ban and to remedy the "self-dealing and gross mismanagement" by the CDC Board of Directors, which had resulted in "corporate abuse and waste of its funds." R. 230, Motion to Enforce/Modify at 1. The motion sought relief against CDC Board members: among other things, to remove from the CDC Board any directors who violated their fiduciary duties, including Carole Steele and Joann Hollie (who was CDC's treasurer and a director); and to order restitution from Steele and Hollie. Mot. to Enforce/Modify at 7–8. On top of that, the CHA sought prospective relief giving the CHA much more of a say in CDC's affairs, including appointment as a non-voting CDC Board member and appointment as a monitor of CDC's expenditures. *Id.* at 8. Separately, the CHA also moved to immediately freeze the assets of the CDC pending resolution of the underlying motion. R. 242.

3

Carole Steele then entered the litigation, moving to intervene and filing a response to the CHA's motion for an immediate freeze order. R. 245, 246. The motion to intervene was denied because no proposed pleading was attached to it, Fed. R. Civ. P. 24(c), but the Court permitted Steele's response to stand given the impact that the CHA's requested relief would have on her and the CDC. R. 247. At the Court's direction, Steele also filed a supplement declaring that the CDC "supports and adopts her response." R. 248. (It is not clear what steps the CDC Board took to formally authorize that filing and the others that followed, but the Court accepts for purposes of considering the pending motion that CDC authorized the filings.)

After considering the back-and-forth filings on the freeze motion, the Court granted in part and denied in part the motion. R. 254. The Court imposed certain financial controls and limits on the CDC, but did not freeze the CDC's funds and allowed the CDC to continue operating pending resolution of the motion to enforce. *Id*. at 3. Around the same time, the LAC moved to suspend briefing on the underlying motion in favor of a referral to the magistrate judge for settlement negotiations and a settlement conference. R. 250. The City, the CHA, and the CDC all agreed, so the Court referred all of them to the magistrate judge. R. 252. From August 2020 through February 2021, the magistrate judge devoted extraordinary time, effort, and expertise in convening multiple (to understate it) settlement discussions and settlement conference sessions, in which the LAC, the CHA, the City, and the CDC participated. R. 256, 257, 258, 260, 261, 262, 263, 265, 266, 267, 268, 269, 270, 271, 275, 276, 277, 278, 280, 281, 285, 286, 290, 291, 293, 294, 296, 297. Given the length of the

4

negotiations, however, at the end of January 2021, the Court scheduled an evidentiary hearing for March 18, 2021, and set pre-hearing deadlines for briefing, exhibits, and witness lists. R. 288.

### C. Motion to Approve Settlement

Two days before the evidentiary hearing, on March 16, 2021, the LAC Board of Directors met and approved a settlement with the CHA. R. 322; R. 324-2, Minutes of 03/16/2021 LAC Meeting. Seven LAC Board members attended the meeting; all seven voted in favor of the settlement. *Id.* The next day, on March 17, the Court held a status hearing, during which the CDC objected to certain aspects of the settlement and asserted that the March 16 LAC Board meeting was not properly convened. R. 323. The Court directed the parties to file a written motion setting forth the settlement's terms and providing supporting documentation, such as the minutes of the LAC Board meeting at which the Board approved the settlement. *Id.*

At the motion hearing on the next day (March 18), counsel for CDC reported that the LAC had purportedly convened the prior evening (March 17) to "overturn" the proposed settlement that had been approved the day before. R. 325. The Court then ordered further briefing to complete the record and to prepare for an evidentiary hearing (if needed) on April 26. *Id.* On the basis of the filings, the Court vacated the evidentiary hearing because live testimony would not be needed to resolve the motion. R. 332. For the following reasons, the Court finds that a settlement has indeed properly been reached between the parties—the LAC on the one hand, and the City and CHA on the other—and accepts the proposed order approving the settlement.

5

## II. Analysis

### A. The LAC's Settlement Authority

The basic governing principles on the formation of settlements (and challenges to their formation) are not in dispute: treat them like contracts. "Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law," so the law of Illinois controls this analysis. *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000). "A settlement agreement is in the nature of a contract and is governed by principles of contract law." *Rose v. Mavrakis*, 799 N.E.2d 469, 473 (Ill. App. Ct. 2003). "Where a party lacks the legal authority to form a contract, the resulting contract is void *ab initio*." *1550 MP Road LLC v. Teamsters Local Union No. 700*, 131 N.E.3d 99, 107 (Ill. 2019) (emphasis in original).

Here, the CDC argues that the LAC—acting through the seven Board members who voted to approve the settlement—did not have the authority to approve the settlement. R. 329, CDC Resp. at 6. The CDC's argument hinges on challenging a vote taken by the LAC Board in August 2020. *Id.* at 1–3. Leading up to that meeting, in late July 2020, the LAC Board had met to determine how to respond to the CHA's motion to enforce and to modify the consent decree. R. 327-1, Maurice Edwards Aff. ¶¶ 10–11. In early August 2020, the LAC's lawyer, Richard Wheelock (an attorney at Legal Aid Chicago) sent the LAC Board members a letter "expressing grave concerns regarding the conflict of interest raised by the dual membership of Carol Steele, Lynell Dillon, and Vincent Davis on the boards of both the LAC and the CDC." *Id.* ¶ 11. The letter laid out what it described as "well-settled law in Illinois that any

6

director with a personal interest in a matter under consideration by a board of directors is disqualified from voting on that matter." *Id.* Indeed, the LAC Board was aware of this conflict of interest even before receiving Wheelock's letter, and had discussed the problem at its late July meeting. *Id.* ¶ 10. The lawyer's letter drove the point home, explaining that Legal Aid Chicago could no longer represent the LAC in anything relating to the motion unless the conflicted board members were recused from deliberating and voting on all related issues. *Id.* ¶ 11. The letter advised the LAC Board that "every LAC member had a legal, fiduciary duty to meet without the conflicted members being present." *Id.*

What happened next refutes the CDC's challenge to the LAC's authority to approve the settlement. On August 18, 2020, the LAC Board convened to discuss the letter and Steele's, Dillon's, and Davis's conflicts of interest. Edwards Aff. ¶ 12. According to the minutes of the meeting, Board member Lisa Nesbitt moved "that Carol, Lynell, and Vincent to recuse themselves." R. 327-2, 08/18/2020 Minutes at 1. Steele, Dillon, and Davis recused themselves from this vote; and the remaining board members passed the motion. *Id.*; Edwards Aff. ¶ 12. The non-conflicted board members then continued to meet regularly from September 2020 through March 2021 to discuss settlement negotiations. Edwards Aff. ¶ 13. Board Vice President Maurice Edwards called these meetings, because President Carol Steele was recused. *Id.* Edwards provided advance written notice of each meeting to all LAC board members, except those who were recused. *Id.* The March 16, 2021 meeting at which the LAC Board of Directors (minus the three who were recused) approved the settlement now

7

at issue was also called by Edwards, with four days' written notice. *Id.* ¶ 14. All seven present and non-conflicted board members voted to approve the settlement. *Id.* ¶ 15.

In challenging the LAC Board's approval of the settlement, Steele first argues that the August 18 vote to recuse her, Dillon, and Davis was only a vote to recuse "from voting on Wheelock's continuing representation," and did not cover recusal from voting on anything else related to the CHA's motion. R. 329-1, Steele Aff. ¶ 15. But even if that is Steele's subjective understanding of the recusal in her own mind, it is definitively refuted by the record evidence. First, the written minutes do not characterize the recusal in that narrow way. Nesbitt's motion was for the three to "recuse themselves," and the minutes go on to broadly say, "Motion carried for them (Carol, Vincent, and Lynell) to recuse themselves." 08/18/2020 Minutes at 1. The minutes do not reflect any *separate* vote on Wheelock's continuing representation of the LAC. *See id.* at 1–2. Instead, as far as votes go, the minutes literally say, "That's it." *Id.* at 2. And all of this is confirmed by the affidavit of Edwards. Edwards Aff. ¶ 12.

Aside from the minutes themselves, the parties' own course of conduct—and Steele's—during the settlement negotiations makes quite clear that the recusal of Steele covered more than just the Wheelock representation question. At the initiation of the settlement conferences, the magistrate judge entered an order requiring "[i]ndividuals with full and complete settlement authority on behalf of the parties to personally participate in the settlement conference." R. 256. Consistent with the recusal as reflected in the minutes, the settlement participants broke into three camps: attorneys from Legal Aid Chicago represented the LAC, with LAC Vice President

8

Maurice Edwards serving as the client representative, R. 326, Defs.' Supp. at 2; the City and the CHA formed the defense camp; and the CDC was represented by separate counsel, Anthony Burch. Nothing in Steele's affidavit contradicts this, and indeed the separateness of the sets of participants is confirmed by the numerous settlement discussions in which the magistrate judge spoke *separately* with the LAC, on the one hand, and the CDC, on the other (separate) hand. *See, e.g.*, R. 257 (LAC), 258 (CDC), 261 (CDC), 263 (CDC), 265 (LAC), 267 (LAC), 270 (LAC), 271 (LAC), 276 (LAC), 278 (LAC), 280 (CDC), 285 (CDC), 286 (LAC), 290 (CDC), 293 (LAC), 294 (CDC), 296 (LAC). All of those docket entries were posted publicly, so Steele and the CDC were well aware that the LAC was engaging in settlement negotiations for months *without* the three recused Board members. Yet neither Steele nor the CDC nor the CDC's counsel raised any objections to the LAC's authority to engage in the extensive settlement negotiations until *after* the settlement had been negotiated and approved. So, whatever Steele's subjective understanding of the recusal, the record establishes that the LAC Board voted to recuse Steele, Dillon, and Davis from the settlement negotiations over the CHA's motion.

In resisting the scope of the recusal, the CDC also argues that Steele, Dillon, and Davis did not suffer from a conflict of interest, contending that the allegations of financial mismanagement were "spurious" and ultimately would be proven untrue. CDC Resp. at 1. As far as the Court can tell, the upshot of this argument is that, in the absence of a conflict of interest, it is more likely that the recusal was narrow. But the conflict of interest was (and is) plain. The CHA's motion sought to remove any

9

LAC Board members who had breached their fiduciary duty, Mot. to Enforce/Modify at 7, and the OIG Report specifically accused Steele of financial mismanagement and, worse, accused her and family members of receiving improper payments, OIG Report at 5 (summary of findings); *id.* at 17–18 (contractor payments to Charles Price, who lived in Indiana, had never lived in public housing, and is the father of Steele's sons); *id.* at 19 (funeral expenses for Steele's brother, who at the time of his passing was not a current or displaced Cabrini-Green resident); *id.* at 21–22 (petty cash expenditures with no supporting records).

With the accusations facing the CDC's Board, the governing Illinois conflict-of-interest law banned Steele, Dillon, and Davis from participating in the LAC Board's determination of what to do about the CHA's motion. Specifically, the Illinois Not For Profit Act provides that a director who is directly or indirectly party to a transaction that is before the board for authorization, approval, or ratification "may be counted in determining whether a quorum is present but *may not be counted when the board of directors or a committee of the board takes action* on the transaction." 805 ILCS 105/108.60(a), (c) (emphasis added). A director "is 'indirectly' a party to a transaction if the other party to the transaction is an entity in which the director has a material financial interest *or of which the director is an officer, director or general partner.*" 805 ILCS 105/108.60(d) (emphasis added). So, as the LAC Board deliberated over what to do with the CDC, the three conflicted Board members could not take action on what to do about, well, *themselves*. That statutory ban is not surprising, given the well-established common law principle that directors owe a duty of loyalty to the

corporation. *See Lawlor v. N. Amer. Corp. of Ill.*, 983 N.E.2d 414, 433 (Ill. 2012). The "duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer[,] or controlling shareholder and not shared by the stockholders generally." *Shaper v. Bryan*, 864 N.E.2d 876, 884–85 (Ill. App. Ct. 2007) (citing Delaware law). The allegations in the motion to enforce directly targeted the CDC and its board. The LAC, as the corporate entity with authority over the CDC's Board (more on that below), would inevitably have to make decisions about the CDC's governance in the course of litigating or settling the motion. Steele, Dillon, and Davis thus would have been placed on both sides of that decision-making process. Indeed, if the LAC Board had not formally passed the motion to recuse the three overlapping directors, and any of the three remained involved in taking action on behalf of the LAC, then it is likely that Illinois law would have retroactively invalidated any votes that the LAC Board would have cast on the CHA's motion. The recusal of the three overlapping members thus was not only valid, but mandatory. So the clarity of the conflict of interest raises the opposite inference from what Steele argues: it corroborates that the scope of the recusal covered all decision-making on the CHA's motion, not just on Wheelock's representation.

This finding also refutes the second argument offered by Steele, namely, that the LAC Board's meetings convened by LAC Vice President Maurice Edwards were unauthorized because Steele did not convene them. The CDC argues that the LAC bylaws do not provide for what it calls the "forced recusal" of a director, but do provide for the *removal* of an officer. CDC Resp. at 3. Because the procedures for removal of

11

an officer were not followed, the CDC argues, the settlement negotiations and the LAC Board's approval of the settlement were invalid. *Id.*

But this argument confuses "removal" and "recusal." The LAC Board voted to *recuse* Steele, Dillon, and Davis from decision-making over the CHA's motion. The recusal was valid under Illinois law (as just discussed above), as well as by the bylaws of the Central Advisory Council (which applies to the LAC). R. 327-3, CAC Bylaws, Arts. III, IV, V (defining and creating the Local Advisory Councils). The bylaws incorporate Robert's Rules of Order, CAC Bylaws § 13.7, and an Ethics Policy in accordance with all "applicable State and Federal law," *id.* § 13.8. Robert's Rules require recusal when a board member has a conflict of interest (or even a potential conflict of interest). Robert's Rules of Order (11th ed.) at 407. Recused directors remain directors for all purposes other than the matter in which they are recused, just as judges recused from a particular case retain their judicial authority in all other cases before them. Steele, Dillon, and Davis were *recused* from this particular matter, not removed from the Board generally. So the removal procedures in the CAC Bylaws, *see* CAC Bylaws §§ 8.3.1–8.3.5, or any other removal procedures, do not apply under the circumstances.

With Steele recused, the CAC Bylaws dictated that the Vice President of the LAC (here, Maurice Edwards) assumed the authority to act as the LAC's President. The CAC Bylaws specifically cover a conferral of authority: "In the absence of the LAC President or in the event of his or her inability or refusal to perform the duties of the office, the *LAC Vice-President shall perform the duties of the LAC President*,

12

and when so acting, shall have all the power and be subject to all restrictions upon the President." CAC Bylaws § 8.1.2 (emphasis added). As the duly elected Vice President of the LAC—and the CDC neither argues nor submits evidence that this was not the case—Edwards was authorized by the CAC Bylaws to preside over the LAC Board's discussions and votes concerning the CHA's motion to enforce. That authority means, too, that the March 16, 2021 meeting at which the LAC Board voted to approve the settlement was properly convened by Edwards. And the unanimous vote to approve the settlement was valid because the recusal of Steele, Dillon, and Davis was still in effect.

In conclusion, the Court finds: (1) LAC Directors Steele, Dillon, and Davis had a conflict of interest due to their dual membership on the CDC and the LAC Boards; (2) Steele, Dillon, and Davis were required by both Illinois law and the CAC Bylaws to recuse themselves from all deliberations and decisions on the CHA's motion; (3) the August 18, 2020 vote to recuse Steele, Dillon, and Davis from those decisions was valid; (4) all meetings called by LAC Vice President Maurice Edwards were properly convened; (5) Legal Aid Chicago attorneys and Edwards were appropriate representatives of the LAC during the settlement negotiations and had full authority to settle the motion; and (7) the March 16, 2021 meeting of the LAC Board, again minus the conflicted and recused directors, was properly convened and the vote to ratify the settlement was valid.[1]

---

[1] In its supplemental brief, the CHA argues that, even if LAC did not have *actual* authority to settle the motion, it had *apparent* authority to do so and thus the CHA is entitled

13

## B. March 17, 2021 "Meeting"

One would think that would end the analysis, but unfortunately not. On the day after the March 16 approval of the settlement, Maurice Edwards learned—at noon—that Carol Steele had purported to convene an "emergency meeting" of the LAC Board for 2 p.m. Edwards Aff. ¶ 16. The meeting's attendees included Steele, Dillon, and Davis, along with most of the remaining, non-recused members of the LAC Board. *Id.* ¶ 17. Edwards objected to the meeting due to the presence of Steele, Dillon, and Davis. *Id.* Nonetheless, Steele moved to "overturn the Proposal of January 11, 2021," which was the settlement proposal approved by the LAC the day before. *Id.* ¶¶ 15, 17. Steele, Dillon, and Davis voted in favor of the motion, as did three non-recused LAC Board members. *Id.* Three other non-recused LAC Board members abstained. *Id.* The CDC does not dispute this narrative, and indeed concedes that "the rules for calling a special meeting were not adhered to." CDC Resp. at 4.

The CDC argues that this vote overturned the settlement approval. CDC Resp. at 4–5. The problem, of course, is that the August 18 recusal of Steele, Dillon, and Davis *did* apply to any decisions on the CHA motion (not just Wheelock's representation). So even Steele's attempt to convene the March 17 meeting to address the CHA motion was invalid, as was the purported vote given the participation of the three conflicted directors. Indeed, even if Steele somehow could convene a meeting on the

---

to rely on those representations. *See, e.g.*, R. 326, Defs.' Supplement at 8. The Court need not resolve that issue given that the LAC's counsel and Edwards had actual authority to represent LAC and to bind it to a settlement.

14

recused issue, the CAC Bylaws require that a "special" meeting of the LAC's Board be noticed in writing at least 48 hours in advance. CAC Bylaws §§ 8.2.2, 13.4.[2] With only two hours' notice by phone, the March 17 meeting was not properly convened. Even if the meeting had been properly convened, and even if their presence at the meeting were proper, Steele, Dillon, and Davis would still not be allowed to vote on any LAC Board decisions on the CHA's motion. So at best the motion to overturn the settlement received three of six eligible votes, falling short of a majority. Nothing that happened during the March 17 meeting altered the settlement approval on March 16.

## C. Approval of the Settlement

With the LAC Board's authorization to enter the settlement now validated, the Court moves on to consider whether the settlement should be approved. It is not clear that the proposed settlement would require a formal modification of the consent decree. There is nothing in particular in the consent decree that is inconsistent with any aspect of the proposed settlement. And of course federal courts routinely adopt agreed resolutions of motions without applying Federal Rule of Civil Procedure 60(b). Out of an abundance of caution, however, the Court will apply Rule 60(b) given the proposed settlement's impact on the CDC and on the public interest.

A consent decree, although contractual in nature, is enforceable as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 378 (1992). As a judgment,

---

[2] "Regular" board meetings require seven days' notice. *Id.* § 8.2.2.

then, a consent decree is subject to modification or to vacatur via Federal Rule of Civil Procedure 60(b). *United States v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002) ("parties wishing to modify or vacate a consent decree may do so by resorting to Rule 60(b)"). Under Civil Rule 60(b)(5), the "court may relieve a party … from a final judgment, order, or proceeding … [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (cleaned up).[3] The movant's burden is met by showing a significant change either in fact or in law. *Rufo*, 502 U.S. at 384.

    Here, the parties agree that, given the facts set forth in the OIG Report, specific and extensive changes are required to ensure that the CDC fulfills the purpose of the LAC's "affiliated development entity" under the consent decree. Consent Decree § III.A.1. Under the decree, the fees and profits from the real-estate developments must be used "for not-for-profit purposes to benefit current and displaced Cabrini-Green residents." *Id.* For example, "the LAC may establish for families residing in affordable rental units a hardship fund" to "provide temporary financial assistance

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

for families unable to meet their housing costs due to loss of income." *Id.* § III.A.6. Given the facts set forth in the OIG Report, which of course arose after the entry of the consent decree, the proposed settlement reasonably pushes the reset button on the CDC so that those important purposes can be fulfilled.

Nor is there any doubt that the LAC has the authority to effectuate the specific terms of the settlement agreement. Not surprisingly, as the affiliated development entity created by the LAC, the CDC Bylaws confer extensive LAC control over the CDC's Board. For example, the LAC "shall appoint the directors of the Corporation[,] … successors for directors whose terms are expiring, and successors to fill vacant positions on the Board of Directors as vacancies arise." R. 244-1, Exh. B, CDC Bylaws § III.2. Outright removal, at any time and for any reason, is in the LAC's hands: "The LAC may remove a director at any time *with or without cause.*" *Id.* § III.8 (emphasis added). So the LAC is entitled to take the steps in the proposed settlement.

What's more, the settlement agreement was the product of good-faith, arm's-length negotiations between the LAC, on the one hand, and the CHA and the City on the other. The CHA did not get everything it had sought in the motion, including direct appointment to the CDC Board and direct monitoring of the CDC's expenditures. Mot. to Enforce/Modify at 8. The Court's confidence in the reasonableness of the settlement is boosted by the extensive and expert involvement of the magistrate judge, and the astonishing 28 times that she engaged with one side or the other in advancing the settlement negotiations. Plus, even though neither Steele nor the CDC were actually parties or intervenors in the case, their perspectives were nonetheless

17

amply presented and considered through the settlement negotiations, as shown by the seven settlement discussions that the magistrate held with the CDC alone, R. 258 (CDC), 261 (CDC), 263 (CDC), 280 (CDC), 285 (CDC), 290 (CDC), 294 (CDC), on top of the CDC's participation in the settlement conferences. The substantive reasonableness of the settlement is a product of a procedurally fair negotiation.

In sum, the settlement is fair and reasonable given what the LAC was confronted with in the CHA's motion to enforce. More litigation might very well have resulted in even stricter measures, especially because a loss on the motion would almost necessarily mean that the LAC was refusing to recognize the seriousness of the risk to the consent decree's purposes. Instead, the proposed settlement shows that LAC has reckoned with the seriousness of the allegations and will take steps in future to ensure compliance with the consent decree, Illinois law, and best practices of nonprofit management.

### III. Conclusion

The joint motion to enter the agreed order approving the settlement, R. 324, is granted. The Court will enter the agreed order separately (the LAC shall email to the Proposed Order account a clean copy of the order, R. 324-1). A telephone status hearing is set for May 12, 2021, at 10 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 21, 2021